

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

BTK
F. #2021R00760

*610 Federal Plaza*
*Central Islip, New York 11722*

March 4, 2024

By ECF

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Arthur Cornwall & Sean Williams
                Criminal Docket No. 23-238 (JMA)

Dear Judge Azrack:

The government writes concerning the defendants' March 20, 2024 sentencings. Defendant Cornwall is former New York City Metropolitan Transportation Authority ("MTA") employee. Defendant Williams is former New York State Court Officer. During the COVID-19 pandemic, at a time when they each earned publicly-financed yearly salaries of around $84,000, along with health insurance and retirement benefits, the defendants entered a conspiracy to steal $770,000 from Small Business Administration ("SBA") loan programs that were intended to provide desperately needed assistance to American business that suffered unprecedented losses because of a sustained global economic and public health crisis. See Def. Cornwall, Oct. 24, 2023 Presentence Investigation Report ("Cornwall PSR") ¶ 56; Def. Williams, Oct. 24, 2023 PSR ("Williams PSR") at ¶ 56.[1]

As described below, the government respectfully requests that the Court impose a term of imprisonment within the United States Sentencing Guidelines range of 27 to 33 months, to be followed by three years of supervised release, as well as restitution of $770,000. See Dec. 8, 2023 Presentence Investigation Report ("PSR") at ¶¶ 66-67, 76.

    I.    Factual Background

In March 2020, the United States and the entire world were confronted with a public health crisis of unprecedented proportions when the COVID-19 novel coronavirus spread across

---

[1] Because the Offense Conduct in both defendants' PSRs is the same, the government will cite to defendant Cornwall's PSR when referring to common facts.

the globe like wildfire, ultimately claiming millions of lives.[2] In an effort to meet this public health crisis, countless businesses across the United States were closed in an effort to slow the spread of the virus. On March 29, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted to attempt to provide emergency financial assistance to businesses that were shuttered in the name of public safety. Cornwall PSR at ¶¶ 3-4.

As part of the CARES Act funds were allocated for the issuance of forgivable loans to small businesses for job retention and payroll related expenses via the Paycheck Protection Program ("PPP program"). Id. at ¶ 5. The PPP program allowed qualifying small businesses to receive unsecured loans to address business expenses such as payroll, rent, mortgage related payments and utilities. Id. If the PPP funds were used for their intended purposes and in accordance with the programs terms, the loans would be forgiven. Id. The PPP program was overseen by the Small Business Administration ("SBA") and various financial institutions received and processed the PPP loan applications, which if approved, would then be funded by the lenders. Id. The amount of the loans was determined by a formula which required applicants to truthfully report information such as the number of employees and payroll costs and provide corroborating documentation. Id. at ¶¶ 5,8. In addition to the PPP program, the CARES Act also provided funding for the Economic Injury Disaster Relief Program ("EIDL program"), which was an SBA program designed to provide up to $2 million in loans to eligible small businesses that experienced financial disruption due to the COVID-19 pandemic. Id. at ¶ 6. Like the PPP program, the EIDL program required applicants to truthfully report information related to a business' operations for the preceding twelve-month period to the SBA through an online portal. Id. at ¶¶ 6, 8. Also like the PPP program, EIDL program funds could only be used for limited, business-related purposes. Id.

Between approximately May 2020 and July 2020, during this devastating global economic and health crisis, the defendants were public employees, who enjoyed middle class lifestyles that was supported by secure government jobs that provided them with salaries of around $84,000 per year and a host of other benefits, including health insurance and retirement benefits. Cornwall PSR ¶¶ 43, 56, 59; Williams PSR ¶¶ 41, 56, 61. At this time, the defendants were homeowners residing in homes in West Babylon and Valley Stream, New York that were each valued at more than $500,000. But the defendants wanted more. Id.

Before the pandemic, the defendants established corporations with the goal of earning money through real estate investments (collectively, the defendants' corporations). Subpoenaed tax returns showed that, in 2019—the year preceding the pandemic—these corporations had no employees and earned no profits. Nonetheless, the defendants worked with other individuals to submit at least six fraudulent PPP and EIDL applications that grossly inflated the earnings, payroll and number of employees of the defendants' Corporations. Cornwall PSR at ¶ 8. For example, on July 14, 2020, the defendants submitted a PPP loan application and supporting documents on behalf of NYC Corporation X. These documents, which were uploaded from an Internet Protocol ("IP") address registered to defendant Cornwall's West Babylon

---

[2] According to the website of the World Health Organization ("WHO"), the COVID-19 pandemic has claimed 6.9 million lives worldwide and 1.1 million lives in the United States. See https://data.who.int/dashboards/covid19/deaths?n=c (last visited December 2, 2023).

residence, stated that NYC Corporation X had eight employees, 2019 salary expenses of more than $232,000 and average monthly salary expenses of more than $22,000. All of this information was false. Instead, as reflected on NYC Corporation X's 2019 federal tax return, the company had just $2,000 in sales in 2019 and no reported salary or wages. Similarly, a PPP loan application and supporting documents that were uploaded from an IP address registered to defendant Williams's Valley Stream residence, falsely stated that another of the defendants' corporations, 4th Quarter Realty Group, had five employees, 2019 salary expenses of $120,000 and average monthly salary expenses of $10,000. Again, all of this information was false. Instead, as established by 4th Quarter Realty's actual 2019 federal tax return, the company reported no income, salary or wages.

Execution of search warrants on the defendants' email and iCloud accounts revealed their motives. For example, in a March 13, 2020 email to defendant Williams and another individual, defendant Cornwall described the defendants' "Business Vision" for their corporations as "[b]uying and flipping properties" and the defendant's "Goals" as "[g]et[ting] out debt"; "[c]reating an emergency fund"; and "[b]udgeting money." See Gov't Exhibit 1 (attached). Of course, none of these "goals" was an acceptable basis for securing a PPP or EIDL loan. In a March 31, 2020 text message to an individual who assisted the defendants in applying for their fraudulently obtained loans ("Individual 1"), defendant Williams explained that he wanted to get at least $500,000 for the defendants' real estate business.

> Individual 1: I think 250K should be good.
>
> Defendant Williams: 500K would be better if you think we can get that. That would allow me to buy up a whole neighborhood in Pittsburgh and renovate it.

See Exhibit 2 (attached).

After they fraudulently stole $770,000 in PPP and EIDL funds, the United States Postal Inspection Service and the United States Attorney's Office subpoenaed corporate and bank records for the defendants' corporations. In summary, the defendants' corporations produced no financial statements that are typical of ongoing corporate entities. In particular, the defendants' corporations produced no balance sheets, income statements or payroll journals for the years before the COVID-19 pandemic. And a review of their bank records in 2020 showed no revenue other than the fraudulently obtained PPP and EIDL loan proceeds. The bank records further showed that the defendants' illegally used the PPP and EIDL loan proceeds to pay more than $147,000 in kickbacks to co-conspirators. In addition, defendant Cornwall illegally used PPP and EIDL proceeds to take $36,000 in cash withdrawals and to pay off more than $31,000 in personal credit card debt. For his part, defendant Williams illegally used PPP and EIDL funds to make over $75,000 in cash withdrawals, to pay more than $110,000 in real estate purchase costs, to purchase more than $33,00 in cryptocurrency and to pay off more than $20,000 in personal credit card debt.[3]

---

[3] Williams contends that he somehow reversed his nine purchases of more than $33,000 in cryptocurrency with PPP and EIDL funds. Williams Sent. Mem. at 9 n.2. Accounting niceties aside, the government's review of subpoenaed records showed that Williams illegally used PPP

3

II. Procedural Background

On June 9, 2023, the defendants both pleaded guilty to a single Count Information that charged them with Conspiracy to Commit Wire Fraud in violation of Title 18, United States Code, Section 1349. Cornwall PSR at ¶ 1.

III. Sentencing Guidelines

The United States Department of Probation calculated the defendants' Criminal History Categories as I and the Guidelines range of imprisonment for both defendants as between 27 and 33 months. Cornwall PSR at ¶¶ 64-65 & n.3; Williams PSR ¶¶ 69-70 & n.4.

IV. Argument

For the reasons set forth below, the government respectfully submits that—as to both defendants—a sentence within the Guidelines range of 27 to 33 months' imprisonment is sufficient, but not greater than necessary to achieve the goals of sentencing as set forth in Title 18, United States Code, Section 3553(a).

A. The Nature and Circumstances of the Offense – 18 U.S.C. § 3553(a)(1)

Against the backdrop of a catastrophic public health crisis that caused immeasurable harm to the public, the defendants elected to manipulatively steal from United States and in the process diverted funds that legitimate small businesses desperately needed. At the time of this theft, the defendants were well-compensated public employees, who had respectively worked as an MTA technician and a Court Officer since 2008 and 2012. They enjoyed middle class lifestyles, owned their respective residences and resided with supportive families. Cornwall PSR ¶¶ 43, 56, 59; Williams PSR ¶¶ 41, 56, 61. As such, their decision to steal $770,000 in PPP and EIDL funds to finance a real estate business was nothing more than a greedy grab at public funds that they were not entitled to. This much is confirmed by the attached email and text message exchange which show, in substance, that the defendants false applications were made simply to advance their personal goals of "buying and flipping" residential homes, including up to "a whole neighborhood in Pittsburgh." See Gov't Exhibits 1 and 2. None of those goals, however, had anything to do with legitimate business expenses caused by the pandemic, which were a daily—and devastating—reality to countless American small businesses.

The defendants' contention that their theft was an effort to save a failing business, see Def. Cornwall's Mem. at 9, or was borne of "haste, desperation, and . . foolhardiness," Def. Williams's Mem. at 10, misses the mark. Based on the subpoenaed bank and corporate records and tax returns, the defendants corporations were side concerns that had no employees or payroll

---

and EIDL funds to purchase cryptocurrency and, to date, has refunded none of the illegally-obtained funds to the government.

4

expenses and that generally earned no more than $35,000 in revenues between 2018 and 2019.[4] Indeed, based upon a review of bank records, the vast amount of funds that these corporate entities earned during their existence was derived from the $770,000 in PPP and EIDL loans that the defendants stole.

And far from using these funds to "reinvest" in the business, the government's bank records analysis showed that the defendants' illegally used the PPP and EIDL loan proceeds to pay more than $147,000 in kickbacks to co-conspirators; that defendant Cornwall illegally took $36,000 in cash withdrawals and that he used another $31,000 to pay off personal credit card debt. None of these expenditures is properly cognizable as a legitimate business expense. Neither is defendant Williams's illegal use of PPP and EIDL funds to make over $75,000 in cash withdrawals, to pay more than $110,000 in real estate purchase costs, to purchase more than $33,000 in cryptocurrency and to pay off more than $20,000 in personal credit card debt. However characterized, these were large cash infusions that the defendants took for themselves and their co-conspirators at the expense of actually cash-strapped businesses that were desperate for government assistance during a truly devastating global crisis. As such, the defendants' actions were borne of greed and deserve the significant punishment reflected in a Guidelines sentence.

B. The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

The defendants' backgrounds as well-compensated public servants makes their decision to manipulatively steal from a public benefits program egregious. Although defendant Williams has contended with significant mental health issues, those problems did not cause him to steal. His calculated desire to be a successful entrepreneur—whether legally or illegally—was the motivation for his theft. Certainly, as a New York State Court Officer and veteran, Williams had ample access to professional resources to cope with any mental health issues that he now raises as a basis for leniency. And defendant Cornwall presents no background circumstances that would justify his blatant theft. Moreover, the defendants' collective lack of criminal convictions is accounted for in the 27-33 month Guideline range applicable to "zero point" offenders, like them. This alone represents a significant reduction from the 33-41 month Guideline range that both defendants stipulated to in their Plea Agreements.[5]

---

[4] Based upon their tax returns, the defendants' reported corporate revenues were as follows: $135,000 (ACornwall Family Industries, Inc., 2019), $5,000 (SL Steele, Inc., $5,000, 2018), $35,000 (SL Steele, 2019), $3,972 (NYC Corporation X, 2017), $1,000 (NYC Corporation X, 2018), $2,000 (NYC Corporation X, 2019). The subpoenaed tax returns, bank records and corporate records do not demonstrate how the defendants' corporations derived any of these revenues. As noted above, the defendants' companies never reported any profits, employees or payroll expenses.

[5] The defendants' comparison to others who received below-Guidelines-range sentences is inapt. These cases either involved relatively minor conduct, such as an elderly defendant's $25,000 gambling operation, or cases in which a defendant "voluntarily reported his misconduct and cooperated with [a] bank in attempting to repay his debt" or engaged in false filings to benefit a loan applicant but "did not act for personal gain or for improper personal gain of

C. Seriousness of the Offense, Promote Respect for the Law, Just Punishment and Deterrence – 18 U.S.C. §§ 3553(a)(2)(A)-(B)

The seriousness of the defendant's offense is self-evident. Blatantly stealing from two programs that were intended to cover legitimate business expenses incurred by small business suffering immense harm during the COVID-19 pandemic is an offense that directly harms the public and, in particular, businesses that desperately needed the funds that the defendant selfishly stole. That the defendants perpetrated this egregious conduct while ensconced in well-paying and secure public sector jobs with benefits that countless Americans suffering from the economic catastrophe of the pandemic would have been grateful to even have access to demonstrates that this offense is extremely serious. As such, the seriousness of the offense and the need for just punishment militates in favor of a Guidelines sentence.

Furthermore, the need for both specific and general deterrence support a Guidelines sentence. Given their willingness to leap at the opportunity to steal from a public program, the defendants must be sentenced in a way that ensures that they will never again seek to benefit themselves at the public's expense. And a Guidelines sentence would deter others who might be tempted to steal from the government, especially in times of crisis, when there is an immense need to rapidly disburse funds to legitimately cash-strapped business. As such, both specific and general deterrence support a Guidelines sentence. In addition, such a sentence would be in keeping with that imposed upon similarly-situated defendants. See United States v. Zarkadas, 21-CR-363 (GRB) (E.D.N.Y.) (51-month prison sentence for $3.5 million PPP and EIDL fraud); United States v. Bellamy, 21-CR-60064 (RKA) (S.D. Fla.) (37-month prison sentence for ex-NFL player who engaged in $1.2 million PPP fraud and paid kickback of more than $310,000 to co-conspirator); United States v. Fleur Williams, 22-CR-252 (JMA) (E.D.N.Y.) (18-month prison sentence for defendant who engaged in PPP and EIDL fraud to acquire more than $280,000 for purported real estate business).

---

another." See Def. Williams Sent. Memo. at 20 (citing United States v. Caruso, 814 F. Supp. 382 (S.D.N.Y. 1993)); Def. Cornwall Sent. Mem at 7 (citing inter alia United States v. Milne, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) and United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005)). Here, the defendants stole $770,000 in public funds while simultaneously taking public salaries; they used the money for their personal benefit and to pay co-conspirators; and they did not self-report their fraud, which was only revealed through the government's investigation. Indeed, had the government not expended its limited resources to reveal their scheme, there is no doubt that it would have remained concealed. As such, the defendant's cited authorities are inapposite and their personal circumstances do not justify a Guidelines variance.

V. Conclusion

As set forth above, the 3553(a) factors demonstrate that the Court should impose a Guidelines sentence of imprisonment of 27-33 months, along with three years' supervised release and restitution of $770,000.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Bradley T. King
Assistant U.S. Attorney
(631) 715-7875

cc: Karen Charrington, Esq. (by ECF and E-mail)
United States Probation Officer Steven S. Guttman (by E-mail)